**CENTRAL COUNTY EMERGENCY
911, Appellant,**

v.

**INTERNATIONAL ASSOCIATION
OF FIREFIGHTERS LOCAL
2665, Respondent.**

No. WD 54519.

Missouri Court of Appeals,
Western District.

April 28, 1998.

Robert W. Stewart, Geoffrey M. Gilbert, William M. Lawson, St. Louis (McMahon, Berger, Hanna, Linihan, Cody & McCarthy, of counsel), St. Louis, for appellant.

Jeffrey E. Hartnett, Bartley, Goffstein, Bollato, Lange, St. Louis, for respondent.

Before ULRICH, C.J., P.J., and LOWENSTEIN and HOWARD, JJ.

ULRICH, Chief Judge, Presiding Judge.

Central County Emergency 911 ("Central"), a fire and emergency dispatching center, appeals the decision of the circuit court affirming the decision of the State Board of Mediation ("Board") finding that shift supervisors were not "supervisory employees" and affiliated with management and, therefore, were appropriately included in the International Association of Fire Fighters, Local 2655 ("IAFF'") bargaining unit with the dispatchers. Central raises two issues on appeal. It contends the Board erred by (1) concluding that shift supervisors were not supervisory employees because the IAFF bore the burden of proving that shift supervisors should be included in the bargaining unit with dispatchers and failed to satisfy the burden; and (2) concluding that shift supervisors were not supervisory employees where the Board's conclusion that shift supervisors were not supervisory employees is unsupported by competent and substantial evidence and is arbitrary and unreasonable because the evidence established that shift supervisors possess sufficient indicia of supervisory status to align them with management and exclude them from the union's bargaining unit. The decision of the State Board of Mediation is affirmed.

### FACTS

Central is the fire and emergency dispatching center servicing St. Louis, Jefferson and Franklin Counties. Central operates on a twenty-four hour basis. Shift supervisors and dispatchers at Central receive emergency calls, take information regarding the emergency from the caller, enter the information into the CAD computer system and determine the appropriate emergency equipment to be sent to the emergency. Another computer activates radios, lights and garage doors at the appropriate fire station to inform the personnel present of the emergency and to facilitate their response to the emergency. The CAD computer system provides the responding personnel the directions to the emergency. After responding personnel at the fire station have been informed of the emergency, dispatchers and shift supervisors relay relevant information to them.

The Board of Directors, comprised of six members from each of the districts with an ownership interest, constitutes Central's controlling authority. The Board of Directors meets three to four times each month. Next in Central's organizational hierarchy is the Operating Committee which consists of the chief administrator of each of the nine fire and ambulance districts serviced by Central. This Committee meets two to three hours each month. The General Manager position is the highest ranking managerial employee

in Central's organizational structure. The General Manager, Michael Turner, reports directly to the Board of Directors. Mr. Turner works approximately fifty to fifty-five hours per week. The shift supervisor is immediately subordinate to the General Manager. Shift supervisors are compensated $17.00 for each hour's work. The last position in the organizational hierarchy is the dispatcher position. Dispatchers are organized into five levels. The wages of dispatchers range from $11.25 to $15.25 an hour. Central's organizational chart provides for four shift supervisors and eight dispatchers. Due to budget constraints, Central currently employs four shift supervisors and six dispatchers.

Shift supervisors are responsible for assigning work to and directing the dispatchers; serving on the committee that interviews prospective employees; training dispatchers; approving shift trade requests by dispatchers; receiving phone calls from dispatchers unable to work assigned shifts; finding replacements for dispatchers unable to attend work; distributing overtime to dispatchers; resolving problems associated with dispatchers' work performance; enforcing work rules; creating the work schedule once per year; updating the CAD computer system; maintaining the day book which contains a record of closed streets, broken fire hydrants and alarm services not in use; managing the ENS computer system that facilitates recognition by residents in addition to the street address; updating the SOP that directs how dispatchers dispatch calls; preparing monthly alarm and classification reports; monitoring calls received; making staffing recommendations; attending outside meetings on behalf of Central; and acting as general manager when Mr. Turner is absent. Shift supervisors are also authorized to issue verbal and written reprimands to dispatchers for rule infractions; to request medical documentation for dispatchers who are excessively absent or tardy; and make decisions regarding occurrences not covered by procedure or policy. If a decision is made regarding an occurrence not covered by procedure or policy, the shift supervisor completes an incident report that may serve as the basis of future managerial decisions. Shift supervisor evaluations of dispatchers are utilized when dispatchers are considered for promotion. On two occasions, dispatchers were hired at the recommendation of a shift supervisor. On one occasion, a shift supervisor recommended a dispatcher be terminated for sleeping at work and, after investigation by Mr. Turner, the dispatcher was terminated.

Central utilizes a rotating four shift system. One shift supervisor and at least one dispatcher comprises a shift. Both shift supervisors and dispatchers are required to receive emergency calls and to dispatch the appropriate equipment. Shift supervisors and dispatchers live and work in the same facilities. The daily log is kept by both shift supervisors and dispatchers. Dispatchers may be required to perform additional duties beyond receiving emergency calls and dispatching appropriate equipment at the direction of a shift supervisor. Dispatchers act as shift supervisors when the shift supervisor is absent. Dispatchers with the same seniority as shift supervisors sometimes work together on the same shift and split time as shift supervisors.

The IAFF filed a petition with the Board on November 21, 1994, seeking to become the exclusive bargaining representative of Central's dispatchers and shift supervisors. The IAFF sought to include both dispatchers and shift supervisors as a single bargaining unit. A hearing was conducted before the Board on February 16, 1995, to determine the appropriate bargaining unit. At the hearing, Central argued that all shift supervisors should be excluded from the bargaining unit based on the nature of the shift supervisors' duties and responsibilities. Mr. Turner was the only witness called to testify at the hearing. The Board issued its decision on June 5, 1995, determining that the shift supervisors were not supervisory employees and, thus, were part of the appropriate bargaining unit. Central County appealed the Board's decision to the circuit court. The circuit court affirmed the decision of the Board on March 3, 1997. This appeal followed.

## STANDARD OF REVIEW

The decision of the State Board of Mediation, not that of the circuit court, is reviewed. *Kendrick v. Board of Police Com'rs*, 945 S.W.2d 649, 651 (Mo.App.1997); *City of Columbia v. Missouri State Bd. of Mediation*, 605 S.W.2d 192, 194 (Mo.App. 1980). The Board's decision is reviewed to determine if it is supported by competent and substantial evidence on the record as a whole. *Id.* Substantial evidence has probative force and is evidence from which the trier of fact reasonably could find the issues in harmony therewith. *Id.* Appellate courts may not substitute their judgment of the evidence for that of the agency, and deference is given to the agency's determination on the weight of the evidence and the credibility of witnesses. *Id.* If the decision of the agency is supported by substantial and competent evidence on the whole record, it must be affirmed. *Id.* An agency's findings are reversed only if the decision is not supported by competent and substantial evidence on the whole record, is an abuse of discretion, is unauthorized by law, or is arbitrary and capricious. *Id.* The evidence together with all reasonable inferences is considered in the light most favorable to the Board's decision. *Id.*

## I. THE IAFF HAD THE BURDEN OF PROVING THE SHIFT SUPERVISORS WERE NOT SUPERVISORY EMPLOYEES

As its first point on appeal, Central argues that the IAFF failed to demonstrate that the shift supervisors should appropriately be included in the bargaining unit with the dispatchers. Central argues that the Board improperly placed the burden of demonstrating the appropriateness of the unit on it rather than the IAFF.

The general rule of law is that the proponent of a particular proposition bears the burden of proving that proposition. *See generally York v. Authorized Investors Group, Inc.*, 931 S.W.2d 882, 887 (Mo.App. 1996) (noting burden of proof rests on proponent of evidence); *Olinger v. General Heating & Cooling Co.*, 896 S.W.2d 43, 50 (Mo. App.1994) (noting burden of proof remains on

proponent of will); *Stewart v. K-Mart Corp.*, 747 S.W.2d 205, 208 (Mo.App.1988) ("The burden of proof on an affirmative defense rests with the proponent of the defense"). The State Board of Mediation adheres to this general proposition of law and places the burden of proving the appropriateness of the bargaining unit on the petitioning party. *St. Louis County Fire Fighters Ass'n, Local 398 v. City of University City*, Public Case No. 76–018 decided July 25, 1977. Accordingly, the burden of proof was on the IAFF to develop evidence demonstrating to the Board that the shift supervisors sought to be included in the bargaining unit share a community of interest with the dispatchers. *Id.*

In commenting on the burden of proof, the Board stated the following:

"the Board does not consider burden of proof concepts to be an appropriate guide to resolving the issues presented by a non-adversarial election petition. The Board's duty in election cases is to discharge its statutory obligation to determine the question of the appropriate unit for the purposes of bargaining. The burden of proof, to the extent one can be said to exist, was on each party to bring forth the information it deemed appropriate to guide the Board in its determination."

By this statement, the Board, in essence, erroneously stated that neither Central nor the IAFF bore the burden of proving the appropriateness of the bargaining unit. The Board, therefore, failed to recognize that the IAFF had the burden of proving the appropriateness of the bargaining unit. While the Board erroneously stated the burden of proof in this case, however, reversal is not warranted. As explained in Point II, *supra*, the IAFF met its burden of proving the appropriateness of the bargaining unit and, therefore, the Board's erroneous statement regarding the burden of proof does not affect the propriety of the Board's decision. Point one is denied.

## II. THE SHIFT SUPERVISORS ARE NOT SUPERVISORY EMPLOYEES

As its second point on appeal, Central argues that the Board's conclusion that shift

supervisors are not supervisory employees is unsupported by competent and substantial evidence. Central argues that the seven factor analysis applied by the Board must be applied in the disjunctive and that, even if the disjunctive is not used, the Board's decision is nonetheless unsupported by competent and substantial evidence because of the nature of the shift supervisors' duties.

The Public Sector Labor Law authorizes employees of any public body, with certain exceptions, to form and join labor organizations for the purpose of collective bargaining. §§ 105.500–.530, RSMo 1994. The State Board of Mediation by this statute is empowered to resolve issues as to the appropriateness of bargaining units and majority representative status. § 105.525, RSMo 1994. One of the primary purposes of the statute is to provide a forum to decide if the bargaining unit proposed by the employees is acceptably constituted. *City of Columbia*, 605 S.W.2d at 194. The Board must decide, in appropriate cases, the status of supervisory personnel and whether they are properly included in the employee bargaining unit because they are employee orientated in job function. *Id.*

While section 105.500 uses the word "employees" without additional specificity in describing the composition of the bargaining unit, the State Board of Mediation has followed the practice of the National Labor Relations Board in holding that certain employees should be excluded from bargaining units containing rank and file employees. *Parkway Sch. Dist. v. Local 902/MNEA*, 807 S.W.2d 63, 67 (Mo. banc 1991); *City of Columbia*, 605 S.W.2d at 194. Supervisors have been excluded on the principle that they should not be included in a bargaining unit with the employees they supervise. *Id.* Supervisors are generally defined as those employees who formulate, determine or effectuate policies on behalf of their employer. *Baer v. Civilian Personnel Div.*, 747 S.W.2d 159, 163 (Mo.App.1988). To determine the supervisory status of employees, the Board has set forth seven factors:

(1) The authority to effectively recommend the hiring, promotion, transfer, discipline or discharge of employees; (2) the authority to direct and assign the work force; (3) the number of employees supervised and the number of other persons exercising greater, similar, or lesser authority with respect to the same employees; (4) the level of pay, including an evaluation of whether the supervisor is paid for his skill or for his supervision of employees; (5) whether the supervisor is primarily supervising an activity or is primarily supervising employees; (6) whether the supervisor is a working supervisor or whether he spends a substantial majority of his time supervising employees; (7) the amount of independent judgment and discretion exercised in the supervision of employees.

*Id.*

Central first argues that the Board was bound by the statutory definition of supervisors contained in the National Labor Relations Act. The N.L.R.B. test for determining supervisory status is set forth at Title 29, section 152(11) of the United States Code. 29 U.S.C. § 152(11) (1994). Section 152(11) defines a supervisor as one:

having authority in the interest of the employer, to hire, transfer suspend, layoff, recall, promote, discharge, assign, reward, or discipline other employees or responsibility to direct them, or to adjust their grievances or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

*Id.* The N.L.R.B. findings that these indicia of supervisory status are disjunctive. *NLRB v. Wilson–Crissman, Inc.*, 659 F.2d 728, 729 (6th Cir.1981). Thus, "[t]he exercise of any one of the enumerated powers combined with 'independent business judgment' is enough to make one a supervisor." *Id.* The Board has given substantial attention to the decisions of the N.L.R.B. *Parkway*, 807 S.W.2d at 67. The Board, however, is not bound by the decisions of the N.L.R.B. *Id.; Missouri Nat. Educ. v. Missouri State Bd.*, 695 S.W.2d 894, 899 (Mo. banc 1985); *City of Joplin v. Missouri State Bd. of Mediation*, 615 S.W.2d 613, 615 (Mo.App.1981).

In *Missouri National Education*, the Missouri National Education Association ("MNEA") petitioned the Board for certification as the exclusive bargaining representative of all clerical employees, teacher aides and school nurses employed by the Belton, Missouri School District. 695 S.W.2d at 896. The MNEA appealed the Board's determination that the school district's secretaries were excluded from the bargaining unit as "confidential employees." *Id.* at 897. In determining the secretaries were excluded from the bargaining unit, the Board expressly abandoned the labor-nexus test utilized by the N.L.R.B. and previously adopted by the Board and adopted the position that if a confidential relationship exists between the employee and managerial or supervisory employee, the employee is "considered confidential" and not an employee under section 105.510. *Id.* at 898. Therefore, employees whose duties involve acting directly or indirectly in the interest of the employer in relation to other employees are excluded from an otherwise appropriate bargaining unit. *Id.* The MNEA urged the court to remand the case to the Board with directions to reinstate the labor nexus test. *Id.* at 898–99. The Missouri Supreme Court rejected the MNEA's contention that the Board was bound by the decisions of the N.L.R.B. *Id.* at 899. It reasoned, "the logical body to develop the meaning of the term 'employees' is the one to which the legislature committed the administration of the statute." *Id.*

Applying the logic of *Missouri National Education*, the Board is not bound by the test utilized by the N.L.R.B. in determining supervisory status. Section 105.525 specifically empowers the Board to resolve issues as to the appropriateness of bargaining units and majority representative status. Pursuant to section 105.225, the Board has set forth seven factors for determining supervisory status. *Baer*, 747 S.W.2d at 163. While many of the Board enunciated factors for determining supervisory status overlap with the factors utilized by the N.L.R.B. for utilizing supervisory status, the Board has, in its discretion, enunciated factors independent of the N.L.R.B. test for determining appropriateness of the bargaining unit. As recognized in *Missouri National Education*, the

Board has the discretion to determine that application of these factors should not be in the disjunctive. Central's contention that the Board is bound by the N.L.R.B. test, therefore, fails.

■ Central next argues that the evidence does not support the Board's decision that the shift supervisors were not supervisory employees. The Board applied the seven factor test set forth in *Baer* and determined that the shift supervisors were not supervisory employees. Relative to factor one, the Board found that while the shift supervisors have a role in disciplining, evaluating and hiring, they were not empowered to hire, fire and promote employees on their own volition. All personnel decisions were made by Mr. Turner. Additionally, the Board noted that how the evaluation of shift supervisors affected promotions of dispatchers was unclear. Relative to factor two, the Board found that the shift supervisors were required to exercise discretion and make quick decisions in the performance of their duties; that discretion, however, related to dispatch matters, not personnel and labor relations matters, which also were Mr. Turner's responsibility. Relative to factor three, the Board noted that four shift supervisors and six dispatchers were employed at Central. The Board concluded that an inordinately high ratio between shift supervisors and dispatchers would exist if shift supervisors were considered supervisory employees. Relative to factor four, the Board noted that shift supervisors earn $1.75 more per hour than the highest paid dispatchers. The Board viewed this additional salary as the next step in dispatcher pay progression to compensate for the additional duties and responsibilities assumed by shift supervisors. Relative to factors five and six, the Board found that the shift supervisors were lead workers rather than supervisory employees. The Board noted that the shift supervisors and dispatchers performed the same duties at least fifty percent of the time. The Board did not note any evidence relative to factor seven. The Board concluded:

the record indicates that the shift supervisors at issue here are skilled employees who perform, incidentally to their work, a

number of supervisory functions. Specifically, they are in charge of the facility on the second and third shifts, ensure proper staffing, monitor the dispatch work performed by the dispatchers to ensure proper performance, issue verbal and written warnings without prior approval, conduct performance evaluations, and may be consulted in matters of hiring. However, the factors just listed are not enough to make them supervisors. Overall, they do not possess sufficient supervisory authority in such combination and degree to make them supervisors.

Analysis of the evidence reveals that the Board's decision was supported by substantial and competent evidence. As noted by the Board, while the shift supervisors have input in determining the hiring, discharge and promotion of dispatchers, the ultimate decision to hire, discharge or promote a dispatcher rests with Mr. Turner. Similarly, while the shift supervisors have discretion relating to dispatch matters, discretion relating to personnel and labor matters is exercised exclusively by Mr. Turner. Mr. Turner, therefore, is the only employee at Central with supervisory authority over the dispatchers. Additionally, the similarity in duties of shift supervisors and dispatchers supports the Board's finding. Shift supervisors and dispatchers perform essentially the same work; both are responsible for answering emergency calls and dispatching the appropriate equipment. While shift supervisors have additional duties beyond dispatching calls, their increased salary reflects those additional duties. The increased salary, however, is not indicative of supervisory status since many of the extra duties are clerical in nature and do not relate to discretion in either personnel or labor decisions. Finally, the relatively high ratio between shift supervisors and dispatchers supports the finding that the shift supervisors are not supervisory employees. The Board's decision, therefore, was supported by competent and substantial evidence.

 Central finally argues that the Board's decision was arbitrary and capricious because the Board's decision conflicts with the Board's decision in *Communications Workers of Am. affiliated with AFL–CIO v. North Central County Fire Alarm System,* Public Case No. 79–059 decided May 29, 1980. As noted by the court in *City of Columbia,* however, no precedential weight attaches to the prior decisions of administrative bodies. 605 S.W.2d at 195. "Courts are not concerned with alleged inconsistency between current and prior decisions of an administrative agency so long as the action taken is not otherwise arbitrary or unreasonable." *Id.* Because substantial and competent evidence supported the Board's decision, the Board's action was neither arbitrary or unreasonable. The Board, therefore, did not err in determining that the shift supervisors were properly included in the bargaining unit with the dispatchers. Point two is denied.

The decision of the State Board of Mediation is affirmed.

All concur.